**[J-86A-2020, J-86B-2020 and J-86C-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| TANYA J. MCCLOSKEY, ACTING CONSUMER ADVOCATE | : | No. 24 MAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 697 CD |
| v. | : | 2019 dated July 11, 2019, |
| | : | reconsideration denied September |
| | : | 4, 2019, Reversing the order of the |
| PENNSYLVANIA PUBLIC UTILITY | : | PUC at Nos. P-2015-2508942, P- |
| COMMISSION | : | 2015-2508948, P-2015-2508936, P- |
| | : | 2015-2508931 dated April 19, 2018 |
| | : | and Remanding. |
| APPEAL OF: METROPOLITAN EDISON | : | |
| COMPANY, PENNSYLVANIA ELECTRIC | : | ARGUED: October 21, 2020 |
| COMPANY, PENNSYLVANIA POWER | : | |
| COMPANY, WEST PENN POWER | : | |
| COMPANY | : | |
| | | |
| TANYA J. MCCLOSKEY, ACTING | : | No. 25 MAP 2020 |
| CONSUMER ADVOCATE, | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court at No. 697 CD |
| | : | 2018 dated July 11, 2019, |
| | : | reconsideration denied September |
| v. | : | 4, 2019, Reversing the Order of the |
| | : | PUC at Nos. P-2015-2508942, P- |
| | : | 2015-2508948, P-2015-2508936, P- |
| PENNSYLVANIA PUBLIC UTILITY | : | 2015-2508931 dated April 19, 2018 |
| COMMISSION, | : | and Remanding. |
| | : | |
| Appellant | : | ARGUED: October 21, 2020 |
| | | |
| TANYA J. MCCLOSKEY, ACTING | : | No. 26 MAP 2020 |
| CONSUMER ADVOCATE, | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court at No. 1183 |
| | : | CD 2018 dated July 11, 2019, |
| | : | reconsideration denied September |
| v. | : | 4, 2019, Reversing the Order of the |

|                                          |     |                                          |
| ---------------------------------------- | --- | ---------------------------------------- |
|                                          | :   | PUC at Nos. R-2017-2624240 & C-          |
|                                          | :   | 2017-2626954 dated July 27, 2018         |
| PENNSYLVANIA PUBLIC UTILITY              | :   | and Remanding.                           |
| COMMISSION,                              | :   |                                          |
|                                          | :   | ARGUED:  October 21, 2020                |
| Appellant                                | :   |                                          |

## **<u>OPINION</u>**

**CHIEF JUSTICE BAER**                                   **DECIDED:  July 21, 2021**

This case presents questions of statutory construction involving whether a recent enactment to the Public Utility Code (Code), 66 Pa.C.S. § 1301.1(a), requiring the inclusion of income tax deductions and credits in rate computations, applies to "distribution system improvement charges" ("DSICs").[1]  In these consolidated cases, the Commonwealth Court reversed the determinations of the Pennsylvania Public Utility Commission ("PUC") and held that Section 1301.1(a) requires public utilities to revise their DSIC calculations to include income tax deductions and credits to reduce rates charged to consumers.  *McCloskey v. Pa. Pub. Util. Comm'n.,* 219 A.3d 1216 (Pa. Cmwlth. 2019); *McCloskey v. Pa. Pub. Util. Comm'n.,* 219 A.3d 692 (Pa. Cmwlth. 2019).  The PUC and the affected utilities appealed.  For the reasons set forth below, we affirm

---

[1] Section 1301.1(a) provides in relevant part:

> If an expense or investment is allowed to be included in a public utility's rates for ratemaking purposes, the related income tax deductions and credits shall also be included in the computation of current or deferred income tax expense to reduce rates.

66 Pa.C.S. § 1301.1(a).

the orders of the Commonwealth Court, although based, in part, upon different reasoning.[2]

In these consolidated cases, several public utilities sought to add or adjust DSICs to recover expenses related to repairing, improving, or replacing their distribution system infrastructure, and the Office of Consumer Advocate ("OCA"), through Acting Consumer Advocate Tanya J. McCloskey, raised challenges to these DSIC computations seeking to add calculations to account for income tax deductions and credits and thereby reduce the rates charged to consumers. At base, the parties dispute whether and, if so, how the addition of Section 1301.1(a) into Subchapter A of Chapter 13 of the Code, requiring inclusion of "income tax deductions and credits" in rate calculations,[3] should apply to the DSIC rate adjustment mechanism of Subchapter B of Chapter 13, 66 Pa.C.S. §§ 1350-1360. In broad strokes, the PUC and the public utilities argue (1) that ambiguity exists as to whether the General Assembly intended Section 1301.1 to apply to the DSIC mechanism; and, assuming *arguendo* that it does apply, (2) that the Commonwealth Court's application of Section 1301.1(a) improperly creates conflicts with the statutory provisions governing the DSIC calculation; and/or (3) that certain existing DSIC statutory provisions can be read to satisfy the requirements of Section 1301.1(a). We address

---

[2] At 24 MAP 2020, four subsidiaries of FirstEnergy Corporation, specifically Metropolitan Edison Company, Pennsylvania Electric Company, Pennsylvania Power Company, and West Penn Power Company, appeal the Commonwealth Court's order and opinion, addressing their DSIC proceedings in *McCloskey v. Pa. Pub. Util. Comm'n.,* 219 A.3d 1216 (Pa. Cmwlth. 2019) (hereinafter "*McCloskey-FirstEnergy*"), and the PUC appeals the same order and opinion at 25 MAP 2020.

At 26 MAP 2020, the PUC challenges a separate order and opinion of the Commonwealth Court addressing the DSIC proceedings filed by Newtown Artesian Water Company in *McCloskey v. Pa. Pub. Util. Comm'n.,* 219 A.3d 692 (Pa. Cmwlth. 2019) (hereinafter "*McCloskey-Newtown*").

[3] Act of June 12, 2016, P.L. 332, No. 40 ("Act 40").

each of these arguments in turn after recounting central aspects of the DSIC mechanism and the procedural history of the consolidated cases before the Court.

## I. Rate Setting and the DSIC Rate Adjustment Mechanism

At its most simplistic, utility ratemaking is intended to compensate utilities for the reasonable costs incurred to provide the public with the relevant utility service, including gas, electricity, water, and wastewater. *See generally* 66 Pa.C.S. § 1301 ("Every rate made . . . by any public utility . . . shall be just and reasonable, and in conformity with regulations or orders of the [PUC]."). As relevant to the categories of public utilities involved in this case, the parties explain that the public utilities obtain approval from the PUC for the "base rates" used to determine the amount customers are charged for the utilities they use. Although this term is not defined by the Code, all parties acknowledge that a base rate is the product of an extensive and complex rate setting process that results in a numerical figure, which is intended to apply for several years.[4] *See* 66 Pa.C.S. § 1308. This base rate, however, is subject to interim adjustments to increase or decrease the rate charged to customers between base rate cases.

One rate adjustment mechanism is the DSIC. The DSIC mechanism, adopted via Act of February 14, 2012, P.L. 72, No. 11 ("Act 11"), allows for a surcharge to be added to the base rate charged to consumers to compensate public utilities for infrastructure investments. The DSIC mechanism was intended to incentivize public utilities to engage in the costly endeavor of repairing, improving, and replacing Pennsylvania's aging infrastructure. 66 Pa.C.S. § 1353(a) (stating that a DSIC provides "for the timely recovery of the reasonable and prudent costs incurred to repair, improve or replace eligible property in order to ensure and maintain adequate, efficient, safe, reliable and reasonable

---

[4] The process by which a base rate is established is referred to as a "base rate case."

service"); *see also, McCloskey v. Pa. Pub. Util. Comm'n*, 127 A.3d 860, 863 (Pa. Cmwlth. 2015) (describing the DSIC process generally) (hereinafter "*McCloskey-Columbia Gas"*).[5]

Prior to this enactment, utilities were unable to adjust their rates between base rate cases to recover the costs of these non-revenue producing and non-expense reducing projects, resulting in a regulatory lag of potentially years between the time utilities expended funds for the infrastructure improvements and when they could recoup that amount from customers through increases in the base rates charged. The DSIC rate adjustment process was intended to reduce this regulatory lag and provide a streamlined rate adjustment process between the more complex base rate proceedings.

The General Assembly enacted detailed statutory provisions regarding the DSIC in Sections 1350-1360, including aspects of the calculation process. It additionally tasked the PUC with the adoption of a "model tariff" to specify what details public utilities must submit in support of their DSIC petitions. 66 Pa.C.S. § 1353(b)(1). In accordance with this provision, the PUC adopted its Model Tariff and other implementing provisions in its *Implementation of Act 11 of 2012,* Docket Number M-2012-2293611, 2012 WL 3249678 (Aug. 12, 2012) (hereinafter "*Act 11 Final Implementation Order*"). The OCA, during the Act 11 implementation process and in at least one prior DSIC proceeding, advocated for modifications to the DSIC calculation to incorporate the tax benefits received by the utilities, through the inclusion of "accumulated deferred income taxes" ("ADIT") and state income tax deductions.[6] The PUC and the Commonwealth Court rejected these

---

[5] As several of the cases addressed herein involve Acting Consumer Advocate McCloskey and the PUC, we will reference the cases utilizing the name of the relevant utility.

[6] In simplistic terms, the OCA argued for the inclusion of these concepts because it viewed the DSIC calculations as improperly allowing utilities to recoup taxes as part of the DSIC investment costs based upon the statutory tax rates rather than the actual taxes paid. The OCA explained that, absent inclusion of ADIT, "ratepayers will pay the utility as if all of its

suggested modifications to the DSIC calculation. *Id.; McCloskey-Columbia Gas*, 127 A.3d 860. The question raised by the case at bar, where the OCA seeks similar modifications to the DSIC calculation, is whether the 2016 enactment of Section 1301.1(a) changes the analysis previously employed by the PUC and Commonwealth Court.

## II. Procedural Histories of the Consolidated Cases

In February 2016, four subsidiaries of FirstEnergy Corporation ("Electric Utilities") filed with the PUC to add DSIC riders to their existing tariffs to recoup infrastructure expenditures. Similarly, in September 2017, Newtown Artesian Water Company ("Newtown") filed a DSIC supplement to increase its existing DSIC.[7] For the purpose of the issues currently before this Court, these filings generally complied with the requirements adopted by the PUC for DSIC rate adjustments, 66 Pa.C.S. §§ 1350-60.

The OCA raised several challenges to the DSIC riders sought by the Electric Utilities and the DSIC supplement filed by Newtown.[8] As relevant to the issues at bar, the OCA faulted the Utilities for failing to account for income tax deductions and credits related to the infrastructure expenses, which the OCA argued is required by Section 1301.1(a), discussed in detail *infra*.[9]

---

DSIC investment was funded by investors, when in fact, a portion of the investment was financed at zero cost using deferred federal income taxes." *McCloskey-Columbia Gas*, 127 A.3d at 866. The OCA also argued that "the state income tax rate . . . must reflect the state income tax expense actually paid, not hypothetical taxes." *Id.*

[7] We will refer to the Electric Utilities and Newtown collectively as "the Utilities."

[8] While the proceedings before the Administrative Law Judges and the PUC involved challenges filed by other entities and numerous other issues raised by the OCA regarding the petitions, we limit our review to the applicability of Section 1301.1(a).

[9] Section 1301.1 was enacted in June 2016, while the Electric Utilities' Petitions were pending before the ALJ and prior to Newtown's 2017 petition.

The OCA proposed specific modifications to the calculations included in the PUC's Model Tariff to account for income tax deductions and credits as required by Section 1301.1, which involved the incorporation of ADIT and state income tax deductions. As noted above, the OCA had advocated for the incorporation of these concepts into the DSIC calculation long before the enactment of Section 1301.1, including prior to the PUC's 2012 implementation of the Model Tariff and in regard to a 2013 DSIC petition filed by Columbia Gas of Pennsylvania, Inc., discussed *infra*.

In response, the Utilities raised several arguments against the incorporation of the OCA's proposed calculations, which they maintain before this Court. Initially, the Utilities asserted that it was ambiguous whether Section 1301.1 was intended to apply to the calculation of the DSIC. Seeing ambiguity, they emphasized that the General Assembly's intent in adopting Section 1301.1 was to address the use of consolidated tax adjustments that were unrelated to the DSIC mechanism. Moreover, they asserted that inclusion of the OCA's suggested calculations would undermine the legislative purpose in enacting the DSIC mechanism, which was to provide a streamlined process for recovering costs to incentivize infrastructure improvements by utilities between base rate cases. They additionally argued that aspects of the current DSIC provisions already address income tax deductions and credits, assuming *arguendo* that Section 1301.1(a) applied to DSICs.

The Administrative Law Judges (ALJ) appointed to address Electric Utilities' and Newtown's DSIC proceedings both agreed with the OCA and concluded that Section 1301.1(a) required alteration of the DSIC calculation formula to include the related tax deductions and credits, which would result in reduced rates. Addressing the Electric Utilities' petitions, the ALJ recommended that the PUC order the utilities to submit additional filings "that fully reflect all federal and state income tax deductions and credits related to placing DSIC-eligible plant in service in the DSIC rate." ALJ Recommended

Decision (Electric Utilities) at 51. Similarly, the ALJ presiding over Newtown's petition concluded that Section 1301.1 applied to the DSIC and recommended that Newtown "account for and reflect all federal and state tax deductions and credits in the calculation of its DSIC, as well that the PUC deny Newtown's request for a DSIC supplement." ALJ Recommended Decision (Newtown) at 70.[10]

After reviewing the various exceptions filed in the cases, the PUC in separate decisions filed a week apart rejected the ALJs' recommendations and instead concluded that Section 1301.1(a) did not require the calculation changes sought by the OCA. Subsequently, the OCA appealed the decisions to the Commonwealth Court.

The Commonwealth Court, in separate unanimous decisions issued on the same day, reversed the PUC's orders and accepted the ALJs' recommended decisions in relevant part, adopting and reproducing substantial portions of the ALJs' analysis. Accordingly, the court remanded for the inclusion of federal and state income tax deductions and credits related to the DSIC investments in the DSIC calculations in accordance with Section 1301.1(a). *McCloskey-FirstEnergy*, 219 A.3d at 1226-27; *McCloskey-Newtown*, 219 A.3d at 703.[11]

Subsequently, this Court granted review of the Electric Utilities' and the PUC's challenges to the Commonwealth Court's holdings in these cases, which were consolidated for argument. The Electric Utilities and the PUC present numerous subsidiary arguments in support of their overarching contention that Section 1301.1(a)

---

[10] Given the complexity of the arguments and the length of the statutes, we recount the details of the lower tribunals' holdings as they arise in connection with the relevant arguments before this Court.

[11] The court originally issued memorandum decisions but later designated both for publication.

should not be applied to alter the well-established formula for calculating DSICs.[12]  For

ease of discussion, we have grouped their arguments in three categories.  First, we

_____

[12] We granted review of the following issues raised by the Electric Utilities at 24 MAP 2020:

> (1) Did the [c]ourt depart from the principle of "plain language" interpretation it claimed to follow where its interpretation of Section 1301.1 of the Code disregards a significant component of the statutory definition of "rate" and, thereby, creates a conflict with specific express terms of Sections 1351, 1357 and 1358 of the Code that could have been avoided if the [c]ourt had followed prior precedent?
>
> (2) Did the [c]ourt err in holding that the PUC was barred from considering the aids to statutory construction set forth in Sections 1921(c), 1922 and 1933 of the Statutory Construction Act even though the Court-endorsed interpretation of Section 1301.1 conflicts with the terms of other sections of the Code, would produce "a result that is . . . impossible of execution or unreasonable," and ignores ambiguities that exist within the four corners of Section 1301.1 itself?
>
> (3) Would the [c]ourt's interpretation of Section 1301.1 obstruct the General Assembly's stated purpose of promoting accelerated replacement of aging and deficient infrastructure across the Commonwealth by impairing the Pennsylvania utilities' ability to recover infrastructure replacement costs in the manner authorized by the express terms of Sections 1350-1360 of the Code?

*McCloskey v. Pa. Pub. Util. Comm'n.*, 229 A.3d 239 (Table) (Pa. 2020).  We additionally granted review of the following issues raised by the PUC in both 25 and 26 MAP 2020:

> (1) Does the manner in which the Commonwealth Court ignored and omitted relevant portions of the statutory definition of "rate," set forth in Section 102 of the Public Utility Code, conflict with the holding of the Pennsylvania Supreme Court that states: if the General Assembly defines words that are used in a statute, those definitions are binding?

consider whether Section 1301.1(a) applies to the DSIC rate adjustment mechanism set forth in Sections 1350-1360.  Finding that Section 1301.1(a) does apply, we next consider whether the Commonwealth Court's application of it to the statutory provisions governing

> (2) Did the Commonwealth Court depart from accepted judicial practices and commit an error of law by not abiding by the rules of statutory construction when it determined that Section 1301.1 of the Public Utility Code, which is a general utility ratemaking statutory provision that eliminated the consolidated tax adjustment from the income tax adjustment computation methodology that is to be used when setting utility base rates, has superseded or repealed Section 1357 of the Public Utility Code, which is a special utility ratemaking statutory provision that explicitly outlines the computation method for calculating the rates for distributed system improvement charge mechanisms?
>
> (3) Did the Commonwealth Court nullify the General Assembly's purpose and intent for enacting alternate ratemaking mechanisms that allow for a simpler and more streamlined ratemaking approach so that jurisdictional public utilities can adjust their rates to recover specific and discrete kinds of costs outside the general rate case?
>
> (4) Did the Commonwealth Court abuse its discretion by not giving deference to the Pennsylvania Public Utility Commission's interpretation of utility law and expertise regarding utility ratemaking and holding that the statutory language of subsection 1301.1(a) of the Public Utility Code was unambiguous and that it was not legally permissible and reasonable to consider matters other than the statutory language in ascertaining the General Assembly's intent for enacting the statutory provision?

*McCloskey v. Pa. Pub. Util. Comm'n.*, 229 A.3d 239, 240 (Table) (Pa. 2020).  The PUC and the Electric Utilities are additionally supported by *Amici Curiae* the Energy Association of Pennsylvania and the National Association of Water Companies - Pennsylvania Chapter, the arguments of which we incorporate into the summary of the PUC and the Electric Utilities' argument.

DSIC calculation results in irreconcilable conflicts. Finally, concluding that Section 1301.1(a) does not conflict, we evaluate their claim that certain existing DSIC provisions, specifically the "earnings cap" of Section 1358(d)(3), satisfy the dictates of Section 1301.1(a). As explained below, we ultimately conclude that Section 1301.1(a) applies to DSICs and requires the Utilities to revise their DSIC calculations to include income tax deductions and credits to reduce rates charged to consumers. Accordingly, we affirm the Commonwealth Court's orders, although based, in part, upon a different analysis.

### III. Application of Section 1301.1(a) to the DSIC Rate Adjustment Mechanism

As noted, this case involves appellate review of the PUC's orders concluding that the enactment of Section 1301.1 does not require revision of the DSIC calculation formula.[13] Critically, the OCA has argued throughout these proceedings that the following

---

[13] We initially observe the broad confines of our review. As we have previously acknowledged, "[a]ppellate review of a PUC order is limited to determining whether a constitutional violation, an error of law, or a violation of PUC procedure has occurred and whether necessary findings of fact are supported by substantial evidence." *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38, 48 (Pa. 2006) (citing 2 Pa.C.S. § 704). In this case, the PUC and the Electric Utilities argue that the Commonwealth Court erred as a matter of law in reversing the PUC's decision based upon an analysis of the relevant provisions of the Code. Thus, the questions before the Court involve pure questions of law involving statutory construction, over which our standard of review is *de novo*, and our scope of review is plenary. *See Snyder Brothers, Inc. v. Pa. Pub. Util. Comm'n*, 198 A.3d 1056, 1071 (Pa. 2018).

We reiterate that "the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). It is beyond cavil that the best indication of legislative intent is the language employed; accordingly, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Id. § 1921(b).

In contrast, "[i]f a statutory term, when read in context with the overall statutory framework in which it appears, has at least two reasonable interpretations" or where "any reading of the statute's plain text raises non-trivial interpretive difficulties" courts should employ the Statutory Construction Act to resolve the ambiguity. *Snyder Brothers, Inc.*, 198 A.3d at 1073.

sentence of Section 1301.1(a) requires tax deductions and credits to be incorporated into the current DSIC calculations:

> If an expense or investment is allowed to be included in a public utility's rates for ratemaking purposes, the related income tax deductions and credits shall also be included in the computation of current or deferred income tax expense to reduce rates.

66 Pa.C.S. § 1301.1(a). This section, in full, provides as follows, which we have separated into sentences for purposes of understanding the parties' arguments:

> (a) Computation. -
>
> [Sentence 1] If an expense or investment is allowed to be included in a public utility's rates for ratemaking purposes, the related income tax deductions and credits shall also be included in the computation of current or deferred income tax expense to reduce rates.
>
> [Sentence 2] If an expense or investment is not allowed to be included in a public utility's rates, the related income tax deductions and credits, including tax losses of the public utility's parent or affiliated companies, shall not be included in the computation of income tax expense to reduce rates.
>
> [Sentence 3] The deferred income taxes used to determine the rate base of a public utility for ratemaking purposes shall be based solely on the tax deductions and credits received by the public utility and shall not include any deductions or credits generated by the expenses or investments of a public utility's parent or any affiliated entity.
>
> [Sentence 4] The income tax expense shall be computed using the applicable statutory income tax rates.

66 Pa.C.S. § 1301.1(a).

We turn to the parties arguments regarding this provision and its applicability to DSIC calculations.

**A. Definition of "Rate"**

All parties and tribunals agree that the statute's use of the term "rate" encompasses DSICs, because a "rate" is defined by the Code to include "charges," and the DSICs are indisputably "charges," as evidenced by their name: Distribution System Improvement Charges. 66 Pa.C.S. § 102 (defining "rate"); § 1351 (defining "DSIC" as "[a] charge imposed by a utility to recover the reasonable and prudent costs incurred to repair, improve or replace eligible property that is part of the utility's distribution system").

The PUC and the Electric Utilities, however, argue that the Commonwealth Court failed to apply the Code's full definition of "rate," which also includes "any rules, regulations, practices, classifications or contracts affecting any such" charge.[14] 66 Pa.C.S. § 102. They assert that a proper reading of Section 1301.1, in conjunction with the full definition of "rate" in Section 102, requires consideration not merely of the calculation of the DSIC percentage but also of the DSIC rules, regulations, and practices. The OCA does not contest the existence or applicability of the second half of the definition of "rate" as including rules, regulations and practices. OCA Brief at 26-27.[15]

---

[14] In full, "rate" is defined as follows:

> "Rate." *Every* individual, or joint fare, toll, *charge*, rental, or other compensation whatsoever *of any public utility*, or contract carrier by motor vehicle, made, demanded, or received for any service within this part, offered, rendered, or furnished by such public utility, or contract carrier by motor vehicle, whether in currency, legal tender, or evidence thereof, in kind, in services or in any other medium or manner whatsoever, and whether received directly or indirectly, *and any rules, regulations*, practices, classifications or contracts *affecting any such* compensation, *charge*, fare, toll, or rental.

66 Pa.C.S. § 102 (emphasis added).

[15] Unless otherwise indicated, references to "OCA Brief" are to the brief filed at 24 MAP 2020.

Accordingly, we observe that the term "rate" as defined in the Code includes not merely the numerical "charge" but also "any rules, regulations, practices, classifications or contracts affecting any such" charge. *66 Pa.C.S. § 102; see Pa. Associated Builders and Contractors, Inc. v. Commonwealth Dep't of Gen. Servs.*, 932 A.2d 1271 1278 (observing that when "the General Assembly defines words that are used in a statute, those definitions are binding"). Thus, for purposes of the DSIC, the term "rate" encompass not only the DSIC percentage applied to the consumer's bill but also the statutory requirements set forth in Sections 1350-1360, as detailed below, as well as the PUC's regulations and orders implementing those statutory provisions. We observe that the Commonwealth Court's focus on the first half of the definition seemingly resulted in it failing to address several of the PUC and the Electric Utilities' arguments arising from the interactions between Section 1301.1(a) and the DSIC procedures, as discussed *infra*.

With this understating of the term "rate," we return to the first sentence of Section 1301.1(a), which applies "[i]f an expense or investment is allowed to be included in a public utility's rates for ratemaking purposes." 66 Pa.C.S. § 1301.1(a). We deem this applicable to the DSIC mechanism which involves the inclusion of an expense or investment for ratemaking purposes. Indeed, inclusion of the reasonable and prudent costs of infrastructure improvements in the rates charged to customers is the entire purpose of the DSIC mechanism.

Applying the remaining portion of the first sentence specifically to DSICs results in the following construction: "income tax deductions and credits [related to the DSIC infrastructure expenses and investments] shall also be included in the computation of current or deferred income tax expense to reduce [DSIC] rates." 66 Pa.C.S. § 1301.1(a). We recognize that the plain language of the first sentence of Section 1301.1(a) appears to require DSIC calculations to include income tax deductions and credits as asserted by

the OCA. The PUC and the Electric Utilities, however, assert that ambiguity arises regarding the term "rate" as used in this sentence when read in the context of Section 1301.1 as a whole.

### B. Potential Ambiguity in Section 1301.1(a)

Throughout this case, the PUC and the Electric Utilities have rejected the OCA's plain language reading of the first sentence of Section 1301.1(a), arguing instead that the term "rate" as used in the first sentence is ambiguous and that the General Assembly did not intend for it to apply to DSICs even though, plainly, DSICs, as charges, are a type of rate. In its decision below, the PUC found ambiguity based upon the interaction of the first and third sentences. The third sentence provides as follows:

> The deferred income taxes used to determine the rate base of a public utility for ratemaking purposes shall be based solely on the tax deductions and credits received by the public utility and shall not include any deductions or credits generated by the expenses or investments of a public utility's parent or any affiliated entity.

66 Pa.C.S. § 1301.1(a). The PUC opined that the third sentence "explain[ed] how the deductions and credits in the first sentence of Section 1301.1 should be calculated." PUC Opinion (Electric Utilities) at 26. In essence, the PUC found the language of the third sentence, which seems to apply primarily to base rate calculations, should not be read to apply to DSIC proceedings, which in turn should limit the reach of the first sentence.

Specifically, the PUC focused upon the third sentence's use of the term "rate base."[16] The PUC recognized that the concept of "rate base" is central to the calculation of a utility's base rate but is not generally involved in the calculation of DSICs, which focuses instead upon specific infrastructure improvement projects and does not involve

---

[16] "Rate base" is defined by the Code as "[t]he value of the whole or any part of the property of a public utility which is used and useful in the public service." 66 Pa.C.S. § 102.

the utility's full rate base.  The implication is that Section 1301.1, while utilizing the broad term "rate" in the first sentence, was focused on base rate calculations rather than intending to address the DSIC calculation process.  The PUC found the incongruity in the application of the term "rate base" to DSIC proceedings created ambiguity in regard to the meaning of the first sentence and whether it should be read to alter the DSIC calculations.

Finding ambiguity, the PUC looked to the legislative history and concluded that the General Assembly's intent in enacting Section 1301.1 was focused upon eliminating the "consolidated tax adjustment" ("CTA"), which is also a concept associated more closely with base rate calculations rather than DSIC calculations.[17]  As explained by the Commonwealth Court in a recent decision addressing Section 1301.1(b), "[t]he CTA required a utility to adjust its rate base to account for the amount of tax savings it received by filing its taxes jointly with its parent and/or affiliated entities."  *McCloskey v. Pa. Pub. Util. Comm'n*, 225 A.3d 192, 198 (Pa. Cmwlth. 2020) ("*McCloskey-UGI*").  Prior to the General Assembly's enactment of Section 1301.1, this Court required utilities to utilize the CTA by dictating that utilities "account for the tax benefits realized by participation in a consolidated return" in their ratemaking calculations.  *Barasch v. Pa. Pub. Util. Comm'n*, 493 A.2d 653, 654 (Pa. 1985).  By adopting Section 1301.1(a), the General Assembly expressly sanctioned the use of a subsidiary's separate return calculations in the third sentence.  As acknowledged by the OCA, the PUC appears to be correct that the General Assembly's primary purpose in enacting Section 1301.1 was to eliminate the CTA.

---

[17] Before this Court in 25 MAP 2020, the PUC highlights comments by legislators during the enactment process supporting the view that Section 1301.1 was intended to apply to base rate cases, eliminating the CTA.  PUC Brief at 34-36.  The PUC emphasizes that Acting Consumer Advocate McCloskey testified during hearings regarding Section 1301.1 advocating against the elimination of the CTA without mentioning any impact on the DSIC provisions. *Id.* at 36; PUC Reply Brief at 12-13.

Having determined that the legislative intent in adopting Section 1301.1 was to eliminate the CTA, the PUC in the case at bar also found no evidence of a legislative intent to alter the well-established DSIC calculation formula as dictated by the statutory provisions discussed in detail below, which would result from the application of Section 1301.1(a) to DSICs. Moreover, the PUC concluded that the addition of tax deductions and credits to the DSIC calculation would undermine the intent for the DSIC to provide a streamlined, speedy recoupment process to provide an incentive for utilities to invest in infrastructure improvements between base rate cases. [18]

On appeal, the Commonwealth Court in both these non-consolidated cases concluded that Section 1301.1(a) unambiguously applied to DSIC calculations, focusing primarily upon and rejecting the PUC's analysis of the third sentence's use of the term "rate base" to create an ambiguity. Finding no ambiguity, the court did not consider arguments relating to legislative history or the impact on the statutory DSIC calculation provisions. *McCloskey-FirstEnergy*, 219 A.3d at 1225-26; *McCloskey-Newtown*, 219 A.3d at 701-03.

In their arguments before this Court, the PUC and the Electric Utilities, to varying degrees, reiterate their argument that the third sentence indicates that the General Assembly intended for Section 1301.1(a) to apply to base rate cases only and not to DSIC procedures. At the very least, they maintain that the third sentence creates ambiguity in regard to the reach of the term "rate," in the first sentence, requiring the utilization of the rules of statutory construction, including consideration of legislative intent. Applying the

---

[18] PUC Commissioner David Sweet entered a dissenting statement concluding that the First Sentence of Section 1301.1 unambiguously applied to DSIC proceedings given that DSIC is a "rate." Focusing almost exclusively on the arguments surrounding the term "rate base" in the third sentence of Section 1301.1, Commissioner Sweet rejected the argument that the term created ambiguity when read in conjunction with the first sentence.

Statutory Construction Act, the PUC and the Electric Utilities emphasize that the General Assembly's primary "object to be obtained" in enacting Section 1301.1 was the elimination of the CTA from base rate proceedings, citing 1 Pa.C.S. § 1921(c).[19]  In contrast, they have found no indication that the General Assembly intended to alter *sub silentio* the statutory provisions codifying the DSIC calculations.

The OCA rejects these arguments, asserting that the General Assembly did not use the terms "rate" and "base rate" interchangeably in other sections of the Code, but instead differentiated between the terms, such that the use of the term "rate" in the first sentence of Section 1301.1(a) was intentional and should be read to be comprised of all rates, including charges such as the DSIC.  It additionally rejects the contention that the term "rate" in the first sentence should be limited to base rate cases based upon Section 1301.1's later use of the term "rate base."  The OCA observes that the DSIC is intended

---

[19] Section 1921(c) directs attention to the following factors for determining legislative intent:

> (1) The occasion and necessity for the statute.
>
> (2) The circumstances under which it was enacted.
>
> (3) The mischief to be remedied.
>
> (4) The object to be attained.
>
> (5) The former law, if any, including other statutes upon the same or similar subjects.
>
> (6) The consequences of a particular interpretation.
>
> (7) The contemporaneous legislative history.
>
> (8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c).

to compensate utilities for infrastructure investments that are not currently included in a utility's rate base, but will eventually be included in the utility's rate base used to calculate subsequent base rates. Thus, the OCA argues, the term "rate base" is relevant to DSIC proceedings and that the use of the term in the third sentence does not create ambiguity regarding the applicability of Section 1301.1 to DSICs.

We respectfully reject the PUC and Electric Utilities' argument that Section 1301.1(a) does not apply to DSICs. Regardless of whether DSICs were an intended target of the General Assembly in enacting Section 1301.1, the words employed in the first sentence plainly encompass DSICs, which provide for "expense[s] or investment[s] . . . to be included in a public utility's rates for ratemaking purposes." 66 Pa.C.S. § 1301.1(a). Moreover, nothing in Section 1301.1 provides a textual indication that DSICs should be exempted from the mandate that "tax deductions and credits shall also be included in the computation of current or deferred income tax expense to reduce rates." *Id.* If the General Assembly deems it preferable to exempt DSIC or other rate adjustment provisions from Section 1301.1(a)'s requirements, it can simply add a phrase clarifying that intent. Nevertheless, as we have repeatedly acknowledged, courts are bound by the statutory language such that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b).

### C. Potential ambiguity pursuant to Section 1301.1(b)

The Electric Utilities posit an additional basis for finding ambiguity concerning whether the first sentence of Section 1301.1(a) should apply to DSICs. In so doing, they direct our attention to subsection (b) and argue that the Commonwealth Court's adoption of the OCA's plain language interpretation creates an internal conflict within Section 1301.1.

The Electric Utilities emphasize their contention that the primary effect of Section 1301.1 is elimination of the CTA, which results in increased rates and likely increased revenue, which is statutorily allocated in Section § 1301.1(b). [20] They argue that Section 1301.1 does not contemplate the reduction of revenue, which would result from the OCA's plain language reading of Section 1301.1(a) to require inclusion of tax deductions and credits in DSIC calculations, which will result in reduced rates. The Electric Utilities argue that "[t]he internal conflict the OCA's interpretation creates is another anomaly that justifies analyzing the Section 1921(c) factors" for addressing ambiguity. Electric Utilities Brief at 54.

In response, the OCA contends that Section 1301.1(a) has two effects: "First, it reduces rates by requiring the utility to reflect income tax deductions generated by its investment. Second, it increases rates by eliminating the requirement to reflect income tax savings generated by filing consolidated tax returns with a parent company or affiliate." OCA Brief at 41 n.117 (emphasis removed). Moreover, the OCA contends that

---

[20] Section 1301.1(b) provides as follows:

> (b) Revenue use.--If a differential accrues to a public utility resulting from applying the ratemaking methods employed by the commission prior to the effective date of subsection (a) for ratemaking purposes, the differential shall be used as follows:
>
> > (1) fifty percent to support reliability or infrastructure related to the rate-base eligible capital investment as determined by the commission; and
> >
> > (2) fifty percent for general corporate purposes.

66 Pa.C.S. § 1301.1(b). Subsection (c) further details that subsection (b) would not apply after December 2025 and that "[t]his section shall apply to all cases where the final order is entered after the effective date of this section." *Id. § 1301.1(c).*

the inapplicability of subsection (b) to DSIC provisions does not prevent the applicability of subsection (a) to DSIC calculations.

We reject the PUC and the Electric Utilities' argument that a reduction in rates resulting from the application of the first sentence to DSICs calculations creates a conflict with the likely increase in rates resulting from the third sentence's elimination of the CTA. The fact that one portion of the statute results in increased rates does not prevent another provision from having the opposite effect. We emphasize that while some aspects of Section 1301.1, including subsection (b), highlights and addresses the likely increase in revenue resulting from the elimination of the CTA, the first sentence clearly indicates the intent to "reduce rates." Accordingly, we reject the PUC and the Electric Utilities' argument that application of the first sentence of Section 1301.1(a) to DSICs creates a conflict with Section 1301.1(b) or ambiguity.

**IV. Asserted Conflicts between Section 1301.1(a) and Sections 1351 and 3157**

Next, the PUC and the Electric Utilities maintain that the Commonwealth Court's interpretation of Section 1301.1(a), as applicable to DSICs, creates a conflict with the statutory provisions governing the DSIC rate adjustment mechanism. They assert that utilities cannot comply with both the Commonwealth Court's interpretation of Section 1301.1(a) as requiring the inclusion of tax deductions and credits while also complying with the statutorily-mandated DSIC calculation formula. Faced with this dilemma, they argue that the Commonwealth Court should have employed statutory construction to examine and avoid the conflict but instead erred in reading Section 1301.1 as "*sub silentio* rewriting specific, carefully-crafted rules for calculating DSIC charges explicitly set forth in Sections 1351 and 1357-58."[21] Electric Utilities Brief at 5.

---

[21] Specifically, Electric Utilities argue that the DSIC statutory provisions of Section 1351 and 1357, as set forth *infra* at 27, n.24, provide that the DSIC is calculated based upon the "fixed cost of eligible property," where "eligible property" is listed for each subset of

The PUC and the Electric Utilities contend that proper application of Statutory Construction Act requires an interpretation of Section 1301.1(a) to avoid the statutory conflict with the DSIC provisions to allow all provisions to be effective. 1 Pa.C.S. § 1921(a) (providing that "[e]very statute should be construed, if possible, to give effect to all its provisions"). They emphasize that Section 1933 teaches that "whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect can be given to both." 1 Pa.C.S. § 1933. The PUC and the Electric Utilities emphasize that if statutes are irreconcilable, "the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail." 1 Pa.C.S. § 1933.

---

utility in Section 1351 and where "fixed costs" are defined as "depreciation and pretax return." 66 Pa.C.S. § 1351, 1357(a), (b).

They assert that neither depreciation nor pretax return includes ADIT, which instead is included as a line item in a utility's base rate calculations incorporating the total property of the utility, along with various other aspects of the complicated base rate case. Electric Utilities Brief at 39-40. To include ADIT in the DSIC calculations, according to the Electric Utilities, would require the use of an "incremental ADIT," based only on the "eligible property" related to the DSIC, despite the complexity of this process and the absence of this language in the statute providing for the additional calculation. Accordingly, they reject the OCA's suggestion that ADIT can merely be subtracted from eligible property, without altering the specific statutory language setting forth the DSIC calculation. Electric Utilities Reply Brief at 8-10.

Likewise, Electric Utilities emphasize that the DSIC statutory provisions do not provide for state tax depreciation deductions. Indeed, they highlight that "[t]he OCA's fundamental error is that income tax 'expense' is not a term of the DSIC formula at all." Electric Utilities Reply Brief at 10. They argue that the OCA's proposals for incorporating these concepts into the DSIC computation would require "the same comprehensive calculations of state income tax employed in a base rate case," thus undermining the legislative intent to simplify the DSIC rate adjustment procedure to incentivize infrastructure expenditures between base rate cases. Electric Utilities Brief at 41.

The PUC and the Electric Utilities assert that Section 1301.1(a) constitutes a general provision governing all rates, while Sections 1351 and 1357 are special provisions relating specifically to DSIC calculations. Accordingly, they argue that the Commonwealth Court should have concluded that any conflict between Section 1301.1(a) and the DSIC provisions should be resolved in favor of the DSIC provisions' applicability. While acknowledging that Section 1301.1(a) was enacted later than the DSIC provisions, they point to the absence of language in Section 1301.1 demonstrating an intent that its general provision should replace the special provisions of Sections 1351 and 1357, detailing the DSIC calculations.

The PUC and the Electric Utilities acknowledge that the General Assembly could have acted to alter the statutory DSIC calculation process but contend that it would have done so overtly by specifically referencing the DSIC calculations in Section 1301.1 or by amending the DSIC provisions themselves rather than *sub silentio* altering the process through the use of the term "rate" in Section 1301.1(a).

They emphasize that the DSIC computation formula has been utilized by the PUC since 1996 and has been incorporated into the DSIC statutory provisions adopted by the General Assembly since 2012. Moreover, the inclusion of the ADIT and the state income tax deductions has been repeatedly advocated by the OCA and consistently rejected by the PUC,[22] which has been tasked by the General Assembly with implementing the DSIC provisions through the adoption of a model tariff. They emphasize that the PUC's rejection of the OCA's recommended inclusion of tax adjustments was subsequently affirmed by the Commonwealth Court in its 2015 decision in *McCloskey-Columbia Gas*, 127 A.3d 860. The PUC and the Electric Utilities emphasize that this Court has instructed

---

[22] A recounting of the OCA's prior attempts to include ADIT and state income tax deductions in the DSIC calculation is set forth in conjunction with the parties' arguments regarding Section 1358 in the next section of this opinion.

that courts should not assume that the legislature intends to abrogate law but rather opined that "[t]he legislature must affirmatively repeal existing law or specifically preempt accepted common law for prior law to be disregarded."  Electric Utilities Brief at 21 n.44, 37 (quoting, *inter alia*, *Roverano v. John Crane, Inc.*, 226 A.3d 526, 538 (Pa. 2020) ("Under the Statutory Construction Act, an implication alone cannot be interpreted as abrogating existing law.")); PUC Brief at 48 (quoting *Truck Terminal Realty Co. v. Dep't of Transp.*, 403 A.2d 986, 989 (Pa. 1979) (opining that "legislative intent to effectuate a drastic change in the law is not to be inferred by mere omission and implication")).

The PUC and the Electric Utilities additionally maintain that the Commonwealth Court's approval of the OCA's inclusion of tax deductions and credits in the DSIC calculations impedes the purpose of Act 11's DSIC provisions, which were intended to incentivize public utilities to replace ageing infrastructure, without the requirement of complex and costly base rate cases.  The PUC contends that DSIC rate adjustment mechanism was originally intended to allow utilities "to automatically adjust their rates outside of a base rate proceeding in order to recover the depreciation and pre-tax return of non-revenue producing, non-expense reducing projects completed and placed in service between base rate cases; and reduce the potential need for more frequent base rate proceedings, with the attendant increased rate case expense."  PUC Brief at 7.  *Amici* Energy Association and the National Association of Water Companies echo this lament, asserting that the OCA's interpretation of Section 1301.1(a) would undermine the purpose of Act 11 by slowing the process of obtaining DSICs and delaying the recovery of the investments by reducing the rate charged, thus diminishing the incentive for utilities to engage in needed infrastructure repairs, contrary to the public interest.  The PUC asserts that "[s]uch a result would clearly harm the public interest by slowing the pace of replacement of aging distribution system infrastructure."  PUC Reply Brief at 18.

The OCA responds that the Commonwealth Court's interpretation of Section 1301.1(a) does not result in a conflict with Sections 1351 and 1357 governing the DSIC calculation which would implicate the Statutory Construction Act. The OCA rejects the claim that a conflict arises between Section 1301.1(a) and the DSIC provisions based upon the absence of a specific calculation addressing tax deductions and credits. The OCA recognizes that the PUC and the Electric Utilities direct attention to the absence of statutory inclusion of ADIT in Section 1351's definition of "eligible property," which references only depreciation and pretax return, and the lack of any calculation related to ADIT in Section 1357's formula for calculating the DSIC. In response, the OCA asserts that "[w]hile the DSIC formula in Section 1357 identifies income tax rates as an element of the pretax return computation, it does not specify how the expense will be calculated." OCA Brief at 30. It contends that Section 1301.1(a) provides that calculation. Therefore, the OCA argues that Section 1301.1 merely supplements, rather than conflicts with, the DSIC provisions, by instructing that tax adjustments should be included in the calculation of rates.[23]

The OCA counters the Electric Utilities' reliance on *Roverano* for the precept that the General Assembly must "affirmatively repeal existing law" or specifically preempt it. OCA Brief at 34 (quoting *Roverano*, 226 A.3d at 538). In contrast, the OCA asserts that there is no need to repeal existing DSIC provisions because there is no conflict between Section 1301.1(a)'s requirement to include income tax deductions and credits and the language of the DSIC provisions.

---

[23] The OCA analogizes the inclusion of ADIT in Section 1357 calculations to the inclusion of the gross receipts tax on DSIC revenue in the DSIC rate calculations. The OCA asserts the PUC properly approved the inclusion of the gross receipts tax, despite the lack of any specific reference to it in Section 1357, because it is related to costs actually incurred by the utility in regard to the investment. It asserts that the inclusion of deductions of ADIT from the eligible property total would likewise reflect the actual expense of the investment. OCA Brief at 32 n.84.

The OCA rejects the PUC and the Electric Utilities' suggestion that the proposed inclusion of tax deductions and credits in the DSIC calculation will undermine the General Assembly's intent to provide a streamlined DSIC mechanism to be employed between complex base rate cases. It contends that the added calculations will not substantially alter the complexity of the DSIC computation process nor jeopardize utilities' ability to recover the costs of investments projects. It proffers that accounting for federal income tax deductions would only require subtracting ADIT from the eligible property. OCA Brief at 31. In regard to state tax deductions, it contends that the two calculation methods it proposed to the ALJ in regard to the Electric Utilities' DSIC petition for state taxes would "require no more than three additional steps to implement." *Id.* at 45. The OCA emphasizes that the ALJ determined that the proposals submitted by the OCA to account for tax deductions and credits were "not unduly burdensome." *Id.* (quoting ALJ Recommended Decision (Electric Utilities) at 32).

Moreover, it rejects the PUC and the Electric Utilities' claims that the inclusion of tax deductions and credits in the DSIC calculations will reduce utilities' ability to recover infrastructure expenditures, thereby providing diminished incentive for needed investment. The OCA asserts that the goal of the DSIC is to allow the utilities to recover only the actual costs incurred in the infrastructure improvement projects, including related taxes. It contends, however, that DSICs should not provide for the recovery of taxes that the utility did not actually pay. It explains that, "[b]y requiring income tax deductions to be included in the computation of income tax expense in the DSIC, Section 1301.1(a) matches DSIC cost recovery to the costs actually 'incurred' by the utility." OCA Brief at 33.

As the parties acknowledge, Sections 1351 and 1357 do not currently include an accounting for income tax deductions and credits. [24] We decline, however, to conclude

---

[24] Section 1357 in conjunction with definitions set forth in Section 1351 provide detailed information regarding the calculation of DSICs. As the sections are lengthy, we summarize the provisions rather than reproducing them in full here.

Section 1357(a) permits the recovery of "the fixed cost of eligible property" "which has not previously been included in a utility's rates. 66 Pa.C.S. § 1357(a)(1). "Eligible property" is defined by Section 1351 as "[p]roperty that is part of a distribution system and eligible for repair, improvement and replacement of infrastructure under this subchapter." *Id.* § 1351. Section 1351 further delineates the specific items allowable as "eligible property" for each category of utility. For example, the statute provides that "[f]or electric distribution companies, eligible property shall include: (i) Poles and towers[;] (ii) Overhead and underground conductors[; and] (iii) Transformers and substation equipment . . . ." *Id.*

Having considered what constitutes "eligible property," we return to Section 1357(a)'s recovery of the "fixed costs of eligible properly." Section 1357(a)(3) explains that "[t]he fixed cost of eligible property shall consist of depreciation and pretax return . . . ." *Id.* § 1357(a). Section 1357(b) then details the elements of depreciation and pretax return:

> (b) Depreciation calculation.--Depreciation shall be calculated by applying the original cost of the eligible property to the annual accrual rates employed in the utility's most recent base rate case for the plant accounts in which each retirement unit of distribution system improvement charge eligible property is recorded. The following shall apply:
>
> > (1) The pretax return shall be calculated using the Federal and State income tax rates, the utility's actual capital structure and actual cost rates for long-term debt and preferred stock as of the last day of the three-month period ending one month prior to the effective date of the distribution system improvement charge and subsequent updates.
> >
> > (2) The cost of equity shall be the equity return rate approved in the utility's most recent fully litigated base rate proceeding for which a final order was entered not

that the absence of a tax adjustment computation in the DSIC proceedings creates a conflict with the requirement for such a computation in Section 1301.1(a). Instead, we conclude Section 1301.1 supplements rather than conflicts with the DSIC computations currently set forth in the statute. By reading Section 1301.1 as adding a requirement, we comply with the legislative directive to construe every statute "if possible, to give effect to all its provisions" and to avoid conflicts between seemingly contradictory statutes. 1 Pa.C.S. §§ 1921(a), 1933. As we do not find a conflict, we need not resolve whether the DSIC provisions act as exceptions to the general directive of Section 1301.1. *See* 1 Pa.C.S. § 1933.

**V. Interaction between Section 1301.1(a) and the Earnings Cap of 1358(b)(3)**

Assuming arguendo that Section 1301.1(a) applies to DSIC calculations, the PUC and the Electric Utilities additionally assert that the "earnings cap" of Section 1358(b)(3) satisfies that requirement and obviates the need to alter the DSIC formula of Sections

---

more than two years prior to the effective date of the distribution system improvement charge.

(3) If more than two years have elapsed between the entry of a final order and the effective date of the distribution system improvement charge, the equity return rate used in the calculation shall be the equity return rate calculated by the commission in the most recent Quarterly Report on the Earnings of Jurisdictional Utilities released by the commission.

*Id.* § 1357(b).

Finally, in addition to various other details, Section 1357(d) provides the basic formula for calculating the actual charge to be applied: the DSIC itself. It instructs that the charge is "calculated by dividing one-fourth of the annual fixed costs associated with all eligible property under the [DSIC] by the projected revenue for the [relevant] quarterly period." *Id.* § 1357(d)(2). Significantly, Section 1357 does not specifically reference income tax deductions and credits in the DSIC computation.

1351 and 1357. Before addressing the parties' arguments we look to the statutory language.

Section 1358, entitled "Customer Protections," provides various safeguards for consumers including an upper limit to the DSIC of 5% or 7.5% of the amount billed to customers, depending on the utility type, absent a waiver from the PUC. 66 Pa.C.S. § 1358(a). Section 1358(b) also provides two situations under which a DSIC is eliminated and reset to zero. It first instructs that the DSIC "is reset at zero as of the effective date of new base rates." *Id.* 1358(b)(1). Section 1358(b)(3) provides an additional situation where the DSIC is reset to zero, which has been termed the "earning cap." It instructs as follows:

> The distribution system improvement charge shall be reset at zero if, in any quarter, data filed with the commission in the utility's most recent annual or quarterly earnings report show that the utility will earn a rate of return that would exceed the allowable rate of return used to calculate its fixed costs under the distribution system improvement charge.

*Id.* 1358(b)(3).[25]

---

[25] Section 1358(b) provides in full as follows:

(b) Charge reset.--

(1) The distribution system improvement charge shall be reset at zero as of the effective date of new base rates that provide for prospective recovery of the annual costs previously recovered under the distribution system improvement charge.

(2) After the reset date under paragraph (1), only the fixed costs of new eligible property that have not previously been reflected in the utility's rate base shall be reflected in the quarterly updates of the distribution system improvement charge.

The PUC has long contended that the earnings cap of Section 1358(b)(3) sufficiently counters the OCA's equally-persistent argument that the DSIC calculations should account for ADIT and state income tax deductions. Indeed, in implementing the Model Tariff in 2012, the PUC initially rejected the OCA's suggestion, explaining:

> [W]e note that the water DSIC,[26] used successfully for over 15 years, did not include an ADIT adjustment. And, in any event, consumers remain protected against over earnings by the earnings cap under Section 1358(b)(3) which captures the revenue impact of all other adjustments and insures that the DSIC does not result in unreasonable rates.

*Act 11 Final Implementation Order* at 63 (internal quotation marks removed).

Similarly, the earnings cap played a central role in the PUC's argument and the Commonwealth Court's conclusion in regard to Columbia Gas's 2013 DSIC petition, where the OCA also sought incorporation of ADIT and state income tax deductions. The PUC responded, as it does in the case at bar, arguing against the incorporation of ADIT and state income tax deductions into the DSIC calculation, contending that "in enacting Act 11, the General Assembly envisioned a simple and straightforward process of

---

> (3) The distribution system improvement charge shall be reset at zero if, in any quarter, data filed with the commission in the utility's most recent annual or quarterly earnings report show that the utility will earn a rate of return that would exceed the allowable rate of return used to calculate its fixed costs under the distribution system improvement charge.

*Id.* § 1358(b).

[26] The DSIC rate adjustment mechanism was originally adopted by the PUC and codified by the General Assembly in 1996, 66 Pa.C.S. § 1307(g)(now-repealed), but was limited to water utilities, until it was extended to "natural gas distribution compan[ies], electric distribution compan[ies], water or wastewater utilit[ies] or city natural gas distribution operation[s]" via Subchapter B, 66 Pa.C.S. §§ 1350-1360, currently under review. 66 Pa.C.S. § 1351.

establishing rates for the DSIC surcharge that would be easy to calculate and audit," in contrast to the complex and elaborate base rate procedures. *McCloskey-Columbia Gas*, 127 A.3d at 867. The PUC additionally maintained that the consumer protections of the earning cap of Section 1358(b) adequately ensured that the rates charged would be just and reasonable as required by Section 1301. *Id.*

The Commonwealth Court in *McCloskey-Columbia Gas* rejected the OCA's arguments regarding the inclusion of the ADIT and state income tax deductions and agreed with the PUC's conclusion that the DSIC procedures "creat[ed] a simplified framework . . . that forgoes the application of certain ratemaking principles that were appropriate for in-depth investigation and review of base rates," in exchange for the customer protections, including the earnings cap of Section 1358(b). *Id.* at 870.

Significantly, the court opined regarding the Commission's discretion in regard to omitting ADIT and state tax deductions from the DSIC calculation, due to the existing consumer protections of the earnings cap:

> Had the General Assembly wanted to prohibit this practice for DSIC mechanisms or even proscribe and curtail the Commission's discretion to allow utilities to continue to utilize this practice, the General Assembly could have explicitly incorporated such a prohibition or placed a limit on the Commission's discretion at the time it enacted Act 11.

*Id. at* 870-71.

In its decision in the instant case, the PUC again relied upon the earnings cap procedure of Section 1358(b) in rejecting the OCA's attempt to include ADIT and state income tax deductions in the DSIC calculation. It observed, "ADIT changes are included in earnings cap calculations and are considered in the determination of the total effect of the DSIC rate." PUC Opinion (Electric Utilities) at 29. It continued, "The earning cap is the accurate approach as it captures the potential magnitude and complexity of ADIT and

other costs without necessarily requiring the DSIC to be treated like a Section 1308(d) base rate proceeding." *Id.*

Addressing state income taxes adjustments in regard to Section 1358(b)'s earnings cap, the PUC explained that "[a] utility's quarterly earnings reports, which are used to determine its achieved rate of return for earnings cap purposes, reflect a wide variety of individual adjustments that would be considered in a base rate proceeding, including state income tax deductions." *Id.* It opined that the earnings cap protected against over-earning by the utilities.

The PUC reasoned that the enactment of Section 1301.1 did not change its conclusion in its initial *Act 11 Final Implementation Order* or the Commonwealth Court's conclusion in *McCloskey-Columbia Gas* that "the DSIC in its current form fully and properly accounts for federal deferred income taxes and state income tax deductions associated with 'eligible property'" *Id.* Accordingly, the PUC rejected the OCA's proposed calculations, which it viewed as adding "unneeded complexity to the DSIC calculation." *Id.* Therefore, it held that Section 1301.1 should not be read to require the inclusion of tax deductions and credits in the DSIC calculation separate from the inclusion of tax concepts in the earnings cap calculations.[27]

Before this Court, the Electric Utilities explain how the provisions of Section 1358(b)(3) satisfy the first sentence of Section 1301.1:

> The earnings analysis conducted each quarter includes all of
> a utility's "income tax deductions and credits" related to its
> property - including incremental additions of "eligible property"
> - that are "allowed to be included in [its] rates for ratemaking
> purposes." If, considering all of the "income tax deductions
> and credits" relating to all of the utility's property, the utility's

---

[27] We observe that the Commonwealth Court in the cases at bar did not directly address the assertion that the DSIC procedures, and specifically Section 1358(b)(3), already encompassed consideration of tax deductions and credits.

> earnings exceed the Commission's determination of a fair return, then the DSIC is "reduced" to zero.

Electric Utilities Brief at 35. They argue that to include the tax adjustments additionally in the calculation of the DSIC rate charged to customers, as calculated pursuant to Section 1357 and the Model Tariff, will result in "count[ing] those tax effects a second time." *Id.* at 13-14. Accordingly, the PUC and the Electric Utilities contend that the inclusion of the earnings cap in Section 1358 meets the requirements of Section 1301.1 by accounting for the required income tax adjustments to reduce the rate charged, without the complexity of including the tax adjustments in the Section 1357 DSIC calculation as proposed by the OCA and adopted by the Commonwealth Court.

In response, the OCA contends that "Section 1301.1 and the earnings cap serve different functions and have a different impact on DSIC rates." OCA Brief at 28. It argues that the earning cap reduces the DSIC rate only when the utility as an entity earns a specified amount, which "may or may not have anything to do with DSIC-related income tax deductions." *Id.* It contends that in cases where the earnings cap does not reduce the DSIC to zero under Section 1358(b)(3), then "Section 1301.1 still requires that the DSIC rate to be reduced by an amount reflecting the income tax deductions related to the utility's investment." *Id.* at 28.

The OCA rejects the invocation of the Commonwealth Court's decision in *McCloskey-Columbia Gas*, contending that the case is inapplicable. First, the OCA distinguishes the issues in *McCloskey-Columbia Gas* and the case at bar. It highlights that that case involved whether the DSIC rate was just and reasonable as required under Section 1301 of the Code, absent an accounting for ADIT and state income tax deductions. In contrast, the OCA emphasizes that this case addresses the impact of Section 1301.1, which was not applicable at the time of the court's holding in *McCloskey-Columbia Gas*.

The OCA acknowledges that the Commonwealth Court in *McCloskey-Columbia Gas* held that the PUC had the authority to interpret the DSIC provisions of the Code to reject the inclusion of calculations related to ADIT and state income tax deductions, given that the Code did not address those calculations and the Code provided protections for consumers such as the earnings cap of Section 1358. However, the OCA argues, that the enactment of Section 1301.1 altered the landscape by requiring the "computation of income tax expenses for ratemaking purposes." OCA Brief at 36-37 (quoting title of Section 1301.1). The OCA explains that the enactment of Section 1301.1(a), therefore, eliminated the PUC's discretion and instead required the PUC to include tax deductions and credits in the calculation of DSICs going forward.

In considering whether the earnings cap of Section 1358(b)(3) satisfies the mandates of Section 1301.1(a), we initially find the current situation readily distinguishable from the scenario facing the Commonwealth Court in *McCloskey-Columbia Gas.* The Commonwealth Court in that case found that the absence of direction from the General Assembly regarding tax adjustments provided the PUC with discretion to omit such calculations from the DSIC computation. In contrast, the plain language of Section 1301.1 enacted by the General Assembly in 2016, however, results in the opposite conclusion, as the legislature has now directed the PUC to include tax deductions and credits in the calculations to reduce rates, such that the PUC no longer has discretion to omit that calculation from the DSIC computation.

We therefore turn to the merits of the PUC and the Electric Utilities' argument that the earnings cap of Section 1358(b)(3) meets Section 1301.1's requirement to include tax deductions and credits in the calculation of rates. We observe that the parties concur that income tax deductions are included in the "data filed with the commission in the utility's most recent annual or quarterly earnings report," which in turn is used to determine

whether the utility's rate of return exceeds the allowable rate, in which case the DSIC is reset to zero. 66 Pa.C.S. § 1358(b)(3). Thus, a cursory read could suggest that this provision meets the requirements of Section 1301.1 by including tax deductions and credits so as to "reduce rates."

Nevertheless, we hold that Section 1358(b)(3)'s earnings cap does not satisfy Section 1301.1. Instead, the "earnings report" utilized is based upon the tax deductions and credits of the utility as a whole, whereas Section 1301.1's language directs the inclusion of "the related income tax deductions and credits." 66 Pa.C.S § 1301.1(a). The "related income tax deductions and credits" are those that are related to the "expense or investment . . . included in a public utility's rates for ratemaking purposes." *Id.* We conclude that the earning cap calculation of Sections 1358(b) does not sufficiently account for the income tax deductions and credits related to a specific DSIC expenditure. Moreover, Section 1358(b)'s earnings cap only provides a remedy in certain quarters based upon the entire utility's financial situation and does not necessarily address the inclusion of tax deductions and credits to reduce rates as required by Section 1301.1(a). Thus, we agree with the OCA that Section 1301.1(a), as applied to a DSIC, requires the inclusion of tax deductions and credits specific to the infrastructure expenses and investments which the DSIC is intended to recover and not tax adjustments of the utility as a whole.

### VI. Deference

The PUC additionally argues that the Commonwealth Court should have deferred to the PUC's interpretation of Section 1301.1 and the DSIC provisions. It observes that the Statutory Construction Act provides that when a statute is ambiguous, the intent of the legislature "may be ascertained by considering . . . administrative interpretations of such statute." 1 Pa.C.S. § 1921(c)(8). It additionally highlights that this Court has

indicated that deference is appropriate in resolving ambiguity when the statutory scheme is technically complex. PUC Brief at 50-51 (citing *Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197, 1203 (Pa. 1997)). As applied to this case, the PUC contends that deference is appropriate based upon "(1) the statute's ambiguity; (2) the Commission's expertise regarding the Public Utility Code; and (3) the complexity of utility ratemaking." PUC Brief at 49.

In contrast, the OCA contends that Section 1301.1(a) and its use of the defined term "rate" unambiguously requires the inclusion of income tax deductions and credits in the calculation of DSICs. Accordingly, it asserts that the PUC's interpretation of the plain language is not entitled to deference.

As our holding is based upon the application of the plain language of the statute, we do not defer to the PUC's interpretation. We reiterate that "[a] court does not defer to an administrative agency's interpretation of the plain meaning of an unambiguous statute because statutory interpretation is a question of law for the court." *Crown Castle NG East LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665, 677 (Pa. 2020).

**VII. Conclusion**

Accordingly, we affirm the orders of the Commonwealth Court remanding these matters "to the PUC for the purpose of requiring [the Utilities] to revise their tariffs and Distribution System Improvement Charge calculations in accordance with Section 1301.1(a) of the Public Utility Code, 66 Pa.C.S. § 1301.1." *McCloskey-FirstEnergy*, 219 A.3d at 1226-27; *McCloskey-Newtown*, 219 A.3d at 703.

Justices Todd, Donohue, Dougherty and Wecht join the opinion.

Justice Saylor files a dissenting opinion in which Justice Mundy joins.